## Case No. 8,673.

McCALL v. McDOWELL et al.

[Deady, 232; 1 Abb. (U. S.) 212; 1 Pac. Law Mag. 360.] [1]

Circuit Court. D. California. April 25, 1867.

DAMAGES—LIABILITY OF MILITARY OFFICERS—SUSPENSION OF THE HABEAS CORPUS—FALSE IMPRISONMENT.

1. In an action for false imprisonment. where the arrest complained of was illegal. but was caused by the defendant. while acting as commanding officer of a military department of the United States. without malice or intention to injure or oppress the plaintiff. but from good motives and considerations. involving the public peace and safety. the plaintiff is only entitled to recover compensatory damages.

2. The defendant having caused the arrest and imprisonment of the plaintiff. who was a civilian. and not amenable to military law. it was his duty to make provision against his be-

1 [Reported by Hon. Matthew P. Deady, District Judge. and by Benjamin Vaughan Abbott. Esq.. and here compiled and reprinted by permission.]

ing treated with undue harshness and severity, or subjected to any treatment or discipline not necessary and proper to restrain him of his liberty for the time being; and having failed to do so, and suffered the plaintiff to be confined in the guard house with drunken soldiers, and to be compelled to labor in common with military culprits, the damages for the false imprisonment must be enhanced on account of such treatment.

3. In an action for false imprisonment, the defendant, by his gross and incendiary language on the news of the assassination of Abraham Lincoln, the president of the United States, having provoked his arrest, though the same was illegal, such provocation must be taken into account in mitigation of damages.

[Cited in Beckwith v. Bean, 98 U. S. 278.]

4. A military subordinate is not liable in damages for making an illegal arrest if he acted in pursuance of an order from his superior, which was legal on its face; the liability for the false imprisonment is confined to the officer who gave the order.

[Cited in U. S. v. Clark, 31 Fed. 716.]

5. Congress is the exclusive judge of "when in cases of rebellion or invasion" the public service requires the suspension of "the privilege of the writ of habeas corpus." In such case it may suspend the privilege of the writ generally or in particular cases; and it may suspend it directly, or it may commit the matter within the proper limits, to the judgment of the president of the United States.

6. The practical object of suspending the privilege of the writ of habeas corpus being to permit and authorize the arbitrary arrest and imprisonment of persons against whom no legal crime can be proved, but who may nevertheless be actively engaged in fomenting the rebellion or inviting the invasion to the imminent danger of the republic, it follows as a necessary consequence, that under the power "to make all laws which shall be necessary and proper to carry into execution" the power of suspension, congress may pass any law necessary and proper to secure or obtain this end, unless expressly prohibited therefrom by the constitution itself.

7. Congress has power to protect officers and persons engaged or concerned in making arbitrary arrests and imprisonments, or arrests or imprisonments without ordinary legal warrant or cause, under the authority or in pursuance of an act suspending the writ of habeas corpus, by the passage of laws indemnifying such officers and persons against the ordinary legal consequences thereof, or declaring that they shall not be liable to an action or other legal proceeding therefor.

8. Semble, that an act suspending the privilege of the writ of habeas corpus, is itself a protection to the officers or persons engaged in making arrests and imprisonments thereunder, against any action or proceeding therefor by the party arrested or imprisoned.

9. The president of the United States has no power to suspend the privilege of the writ of habeas corpus, except as authorized and directed by congress, and therefore the proclamation of September 24, 1862 (13 Stat. 730), so far as it undertakes to suspend such privilege, was unauthorized and void.

10. The act of congress of March 3, 1863 (12 Stat. 755), authorizing the president to suspend the privilege of the writ of habeas corpus, and the proclamation of September 15, 1863 (13 Stat. 134), suspending the same in certain cases in pursuance of said act, do not justify or protect the defendant in causing the arbitrary arrest and imprisonment of the plaintiff, because not done in pursuance of the special authority or order of the president, as by said act provided, but by the defendant of his own will and judgment, as a matter necessary as he conceived to preserve the public peace in his department.

11. Neither does the act of May 11, 1866 (14 Stat. 46), furnish a defence to the action for the false imprisonment by the plaintiff, because in causing the arrest and imprisonment of the plaintiff, the defendant did not act under the order of "the president or secretary of war" or other person, but in obedience to what was deemed public necessity.

This was an action for false imprisonment, and by the stipulation of the parties was tried by the court without the intervention of a jury. The facts in the case are fully stated in the following findings of the court:

First. That on June 1, 1865, the defendant, Charles D. Douglas, was a captain in the army of the United States, then serving in the state of California, and that such defendant, as such captain, was then acting as commander at a military post, called Fort Wright, in the county of Mendocino, and state aforesaid.

Second. That on the day and year aforesaid, at Potter Valley, in the day time, on the public highway, in the county and state aforesaid, the defendant Douglas did order and cause the arrest and imprisonment of the plaintiff, John McCall, for the space of thirteen days; and that said defendant during the term of said imprisonment, did convey and transport the said plaintiff, in close custody, under a military guard, by the usual means of transportation, by land and sea, to the city of San Francisco, in the state aforesaid, a distance of one hundred and fifty miles.

Third. That the defendant, Douglas, on June 13, 1865, at San Francisco aforesaid, did deliver the plaintiff into the custody of the provost marshal of the United States, where his hands were confined and manacled, and from whence the said plaintiff was, by order of said provost marshal, transported in close custody, under a military guard, to a military post and fort, called Fort Alcatraz, situate upon Alcatraz Island, in the county of San Francisco, and state aforesaid.

Fourth. That said plaintiff was kept a prisoner in close custody, without manacles, under a military guard, in said Fort Alcatraz, for the space of six days, and during such imprisonment was compelled and required by the persons having him in custody at said Fort Alcatraz to perform manual labor, in common with prisoners belonging to the military forces of the United States then confined at said fort, as a punishment for military offenses.

Fifth. That during the years 1864 and 1865 the defendant, Irvin McDowell, was a brigadier-general in the regular army of the United States and a major-general of volunteers in the military service of the United States; and that during such years such defendant was the commander of the military department of the United States, known as the department of the Pacific, which department included the states of California, Ore-

·gon, and Nevada and the territory of Washington, and that said state of California was a separate district of said department, and under the immediate supervision of a district commander—General Wright.

Sixth. That on April 17, 1865, the defendant, McDowell, caused to be issued the following order: "Headquarters Department of the Pacific, San Francisco, Cal., April 17, 1865. General Order, No. 27. It has come to the knowledge of the major-general commanding that there have been found within the department, persons so utterly infamous as to exult over the assassination of the president. Such persons become virtually accessories after the fact, and will at once be arrested by any officer or provost marshal or member of the police having knowledge of the case. Any paper so offending or expressing any sympathy in any way whatever with the act, will be at once seized and suppressed. By command of Major-General McDowell. R. C. Drum, Assist. Adj. General."

Seventh. That at the date of such general order No. 27, the populace of San Francisco was in a highly excited and tumultuous condition, on account of the assassination therein referred to, and had already proceeded to commit acts of violence upon the property of persons known to sympathize or suspected of sympathizing with the then existing rebellion by the "Confederate States," against the United States, and still threatened in large numbers and with imposing force to continue such violence against both the persons and property of such sympathizers. That it seemed highly probable that such excitement and disorder would extend throughout the department, and result in unlawful strife and violence, destructive to the lives and property of the people, unless the military authority (which alone possessed the physical power) should summarily interfere to remove and restrain persons who should make themselves obnoxious to the popular sentiment by such exultations; and that such order was made and issued by the defendant, McDowell, reluctantly, and at the solicitation and upon the urgent request and advice of prominent and responsible citizens of San Francisco, for the reasons and causes above stated, as a means of preventing popular tumult and violence, and of preserving the public peace and order, and not from any desire or purpose upon the part of the defendant, McDowell, to molest, injure, or oppress the plaintiff herein, or any other person, and without any malice or ill will towards the said plaintiff, or any other person whomsoever.

Eighth. That during the progress and existence of the rebellion aforesaid, and at the date of order No. 27, it had been and was deemed necessary by the proper authorities, to maintain and keep an organized military force throughout such department, to discourage and prevent acts of hostility there-

in, against the authority and power of the United States, and in aid of the rebellion aforesaid; and that the defendant, McDowell, when he issued order No. 27, as aforesaid, had good reason to believe, and did believe that the peace and security of the department aforesaid would be seriously endangered, unless public disturbances, growing out of the conflicting sympathies and antipathies engendered by the rebellion aforesaid and the war for its suppression, were prevented or promptly put down, and all causes or pretexts therefor removed.

Ninth. That the plaintiff herein was a native born American citizen, and that during the month of April, 1865, and prior thereto, and at the date of the arrest aforesaid, was a resident of Potter Valley aforesaid, and was then and there engaged in farming and stock rearing, and that said plaintiff, on the public highway, in the day time, at Potter Valley aforesaid, on April 20, 1865, did publicly declare and say—"That Lincoln (thereby meaning the late president of the United States) was shot, and that the damned old son of a bitch should have been shot long ago, and that some more of his kind would go the same way shortly." And that the said plaintiff on the public highway, in the day time, at Potter Valley aforesaid, on April 29, 1865, did publicly declare and say: "That he did not believe that General Lee had surrendered, and believed that General Lee was still carrying on the war; and that he did not believe for a long time after hearing of the president's assassination that it was true; and said, I am only afraid that it is not so—if three or four more of the leaders of the abolition party were killed it would be a good thing, as it would be the downfall of that party."

Tenth. That the defendant, Douglas, arrested and imprisoned the plaintiff, as above stated, in obedience to general order No. 27, aforesaid; and because, before making such arrest, the said defendant had information upon oath that the plaintiff herein had uttered the words above mentioned, as spoken by him on April 29, 1865; and also that said defendant had information upon oath, upon the day of making such arrest, but some hours thereafter, that the plaintiff herein had uttered the words above mentioned, as spoken by him on April 20, 1865; and not from any desire or purpose upon the part of the said defendant, Douglas, to molest, injure, or oppress the plaintiff herein, and without any malice or ill will towards the said plaintiff whatever.

Eleventh. That the defendant, McDowell, did not procure, advise, or cause the arrest, imprisonment, or detention of the plaintiff, otherwise than as above stated; and that said defendant subsequently issued an order, in obedience to which the said plaintiff was removed and discharged from Fort Alcatraz, as above stated, and turned over to the civil authority, to wit, the United States

marshal for the district of California, and that said plaintiff was then and there by said marshal taken before the district court of the United States for the district aforesaid, when and where said plaintiff was, by the order of said court, set at liberty, he first taking the oath of allegiance to the United States government, as by act of congress provided, entitled, "An act relating to habeas corpus, and regulating judicial proceedings in certain cases," approved March 3, 1863 [12 Stat. 755].

Twelfth. That the plaintiff during his arrest and imprisonment as aforesaid, and on account thereof, was obliged to expend the sum of one hundred and ten dollars in money, of which said sum he paid twenty-five dollars to an attorney for services rendered to him in and about the matter of his discharge from such imprisonment; and that the said plaintiff did not sustain any special injury to his person or property by reason of such arrest and imprisonment.

Thirteenth. That for and on account of the loss of time and absence from home caused to the plaintiff by reason of such arrest and imprisonment, and for aid on account of the injury to his feelings and bodily suffering and anxiety of mind necessarily resulting therefrom, the court assesses the damages of the plaintiff, in addition to the sum above mentioned, at the sum of five hundred dollars.

And the court finds, as a conclusion of law from the premises, that the defendant, Douglas, is not liable to the plaintiff as he hath complained against him, and that such defendant is entitled to judgment against the plaintiff in bar of this action, and for his costs and expenses in this behalf sustained. And the court further finds, as aforesaid, that the defendant, Irvin McDowell, is liable to the plaintiff as he hath complained against him, and that the plaintiff is entitled to have judgment against said last named defendant for the sum of six hundred and thirty-five dollars damages, and his costs and expenses in this behalf sustained.

Henry P. Irving and George Pierce, for plaintiff.

Delos Lake, for defendants.

DEADY, District Judge. On the trial of the issue in this action, by the court, the defendants were allowed to give evidence of the circumstances attending the promulgation of order No. 27, supra, and the consequent arrest and imprisonment of the plaintiff; not as a justification, but in mitigation of damages. From the evidence the court has found the fact to be, that the defendant, McDowell, issued the order which led to the arrest and imprisonment complained of, without malice or any intention to injure or oppress the plaintiff, but from good motives and considerations involving the public peace and safety; and also, that the defendant, Douglas, acted in the premises without malice or evil intention, but in obedience to the order of his superior, and upon satisfactory information that the plaintiff's conduct had brought him within the purview of the order. These facts, although not sufficient to constitute a legal justification of the conduct of the defendants, are to be considered in estimating the amount of damages which the plaintiff is entitled to recover. The acts complained of, being done without the authority of law, the plaintiff, as a matter of law, is entitled to recover some damages therefor. But vindictive or exemplary damages are only given where it appears that the wrong complained of was done with an evil intention or from a bad motive. In the present case, no such intention or motive can be attributed or imputed to either of the defendants. It follows that the plaintiff is only entitled to recover damages for the necessary consequences of the act complained of—what the law calls compensatory damages.

Still what are merely compensatory damages, in a case like this, is difficult of determination, and is, after all, a matter of opinion, not to say conjecture, rather than direct proof. The only loss which the plaintiff sustained, that can be at all accurately computed and compensated in money, is his loss of time and expenses. What his time was worth does not directly appear, and can only be inferred from his occupation and position in life. Allowing him for this, at the rate of five dollars per day for twenty-one days, which includes the two days that he was in the custody of the civil authorities, would make the sum of one hundred and five dollars, which, added to his expenses and counsel fees, would amount to two hundred and fifteen dollars. In estimating the damages of the plaintiff, beyond this amount, there is no guide but the judgment, and the rule that they are to be given as a compensation to the plaintiff and not as a punishment of the defendants or an example to others. In estimating the damages of the plaintiff beyond his expenses and loss of time, I have been materially influenced by the facts, that while in the custody of the provost marshal in San Francisco he was confined one night in the common guard house in company with drunken soldiers, and that while he was in custody at Fort Alcatraz he was compelled to labor in common with military culprits. The treatment of the plaintiff in these respects, was, to say the least, oppressive and uncalled for. True, it does not appear that this was done with the knowledge or approbation of defendant, McDowell, but so far as appears, it would seem that he did not expect or intend that "political prisoners" should be required to labor while at Fort Alcatraz. The plaintiff was not in the actual custody of the defendant, McDowell, but of his subordinates, and his treatment in these respects was the direct act of the latter and not the former. Yet,

McDowell, having caused the arrest and imprisonment, ought to be held responsible for whatever injuries and indignities the plaintiff suffered thereby, in consequence of his neglect or omission to provide against the same. The provost marshal's office and Alcatraz were within the command and under the authority of McDowell, and having caused the imprisonment of the plaintiff, he should have taken some precaution to prevent his being treated with undue harshness and severity while in custody at these places. In Dinsman v. Wilkes, 12 How. [53 U. S.] 405, which was an action brought by a marine against Commodore Wilkes, for illegal imprisonment in a jail at Honolulu, the supreme court say, that "it was his duty, through proper and trustworthy officers, to inquire into his situation and treatment, and to see that it was not cruel or barbarous in any respect." It is proper to add that the court held Wilkes to something more than the ordinary responsibility of a commanding officer in that respect, because "he had placed him out of the protection which the ordinary place of confinement on shipboard afforded, in a prison belonging to and under the control of an uncivilized people." So it appears to me in this case, the plaintiff being a private citizen not belonging to the military forces. nor under condemnation as a criminal, when the defendant, McDowell, caused him to be imprisoned with military culprits and persons subject to military law and discipline, it was his duty to provide that the plaintiff should not be confounded with them and treated like them. And although, as I have said, I am satisfied that the defendant, McDowell, neither expected or intended that the plaintiff should be subject to any treatment or discipline beyond what was necessary and proper to restrain him of his liberty for the time being, yet as such treatment and discipline were among the probable consequences of the plaintiff's confinement, when and where it took place, if not provided against by the department commander, I think he must be held responsible for it.

In considering the question of damages, I have also taken into account the conduct of the plaintiff, which directly provoked his arrest. I refer to the gross and incendiary language uttered by him on the public highway, on April 20 and 29. Of course I do not mean to assert that the utterance of these words by the plaintiff, as the law then stood and still stands. was technically a crime. Such utterance did not constitute a crime, and therefore was not a legal cause of arrest. Yet in actions for injuries to the person, the misconduct of the plaintiff by which such injury is provoked is always considered in mitigation of damages. 2 Greenl. Ev. § 267. Mere words do not constitute an assault, and therefore will not justify a battery, yet when the words are calculated to provoke and do provoke the battery, they may be given in evidence to mitigate the damages. If one calls another a liar, this does not justify an assault by the insulted party; yet if an assault follow in consequence of the insult, the provocation must be considered in estimating the damages. This rule, it seems to me, may be properly applied in this case. If the plaintiff had uttered these words in the immediate presence of General McDowell, and the latter had knocked him down on the instant, the law would have allowed the provocation to be shown in mitigation of the damages resulting from the illegal blow. In this case the arrest and imprisonment of the plaintiff, although without authority of law, was, I may say, procured and provoked by conduct on his part at once dangerous and disgraceful, and well calculated at that moment of intense public feeling and anxiety, to have brought harm on himself and trouble to the community. Talk and reason as we will about the liberty of speech, something is due to society from every reasonable being who enjoys its protection and privileges. At least, in such an hour of public sorrow and alarm as that which followed the assassination of the president of the republic; during the dangers of a civil war, the plaintiff, whatever his political prejudices or opinions, should have bridled his tongue so far as not to exult at the calamity of the nation, or mock at its fear.

I do not forget that on the trial the learned counsel for the plaintiff questioned the fact, whether the plaintiff used the language attributed to him by the witnesses, Purcell and Hale. The affidavits of these persons, upon which the arrest was made, have been read in evidence, and Hale, the witness to the words uttered on April 20, comes upon the stand, in the presence of the plaintiff, and testifies to the same effect as in his affidavit. There was nothing in the appearance or manner of the witness calculated to detract from his credibility. There was no contradictory testimony upon the point, either direct or circumstantial, and the court, sitting as a trier of the fact. could not have found it otherwise. But another circumstance makes it absolutely certain that the plaintiff substantially uttered the words imputed to him by these witnesses, as the court has found. On the trial, the plaintiff was in court, and was examined as a witness in his own behalf, yet his counsel forbore to interrogate him upon this point. The natural and irresistible inference from this omission is, that the plaintiff was conscious of the truth of the charge, and was too honest to deny it if he had been examined concerning it.

In a case of so much importance as this, and being tried without a jury, I have deemed it proper and due to myself to submit the following suggestions concerning the conclusions of fact found, before proceeding to consider the questions of law arising thereon.

This action has been tried upon the assumption, that Douglas is equally liable with

McDowell, for the arrest of the plaintiff. Granting this, his liability cannot be extended beyond the time when he delivered him to the provost marshal in San Francisco. The imprisonment. so far as Douglas is concerned, then terminated. He did no further act in the premises, and he had no authority over those who did, nor is he in any sense responsible for what happened to the plaintiff thereafter. If the plaintiff had been killed by the guard while at Alcatraz. the defendant, Douglas, could as well be held liable for it, as for the imprisonment which the plaintiff suffered there. But I am not satisfied that Douglas ought to be held liable to the plaintiff at all. He acted not as a volunteer, but as a subordinate in obedience to the order of his superior. Except in a plain case of excess of authority, where at first blush it is apparent and palpable to the commonest unstanding that the order is illegal, I cannot but think that the law should excuse the military subordinate when acting in obedience to the orders of his commander. Otherwise he is placed in the dangerous dilemma of being liable in damages to third persons for obedience to an order, or to the loss of his commission and disgrace for disobedience thereto. If Douglas is liable to the plaintiff. so is every private soldier who constituted his guard from Potter Valley to San Francisco, and even the almost unconscious sentry who stood guard at the prison of Alcatraz. Yet there was no alternative for either Douglas or these soldiers, but to do as they did, or refuse obedience to their lawful superiors. in a matter of which they were incapable of judging correctly, at the peril of disgrace and punishment to themselves. The first duty of a soldier is obedience. and without this there can be neither discipline nor efficiency in an army. If every subordinate officer and soldier were at liberty to question the legality of the orders of the commander. and obey them or not as they may consider them valid or invalid, the camp would be turned into a debating school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions.

In Martin v. Mott, 12 Wheat. [25 U. S.] 19, a question arose as to whether the president had authority to call out the militia in a particular exigency. A drafted militia man had refused to be mustered into the service of the United States, because, as he alleged, the president had made the order in a case not contemplated by the act of congress under which he professed to act. The supreme court held, "that the authority to decide whether the exigency had arisen, belongs exclusively to the president, and that his decision is conclusive upon all other persons." The reasoning of the court in support of this conclusion is peculiarly in point upon this branch of the case at bar:

"The power itself is to be exercised upon sudden emergencies. upon great occasions of state, and under circumstances which may be vital to the existence of the Union. A prompt and unhesitating obedience to orders is indispensable to a complete attainment of the object. The service is a military service, and the command of a military nature; and in such cases. every delay. and every obstacle to an efficient and immediate compliance, necessarily tend to jeopard the public interests. While subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of the facts upon which the commander in chief exercises the right to demand their services, the hostile enterprise may be accomplished without the means of resistance. If a superior officer has a right to contest the orders of the president upon his own doubts as to the exigency having arisen, it must be equally the right of every inferior officer and soldier; and any act done by any person in furtherance of such orders would subject him to responsibility in a civil suit, in which his defense must finally rest upon his ability to re-establish the facts by competent proofs. Such a course would be subversive of all discipline, and expose the best disposed officers to the chances of ruinous litigation. Besides, in many instances, the evidence upon which the president might decide that there is imminent danger of invasion, might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state. which the public interest, and even safety. might imperiously demand to be kept in concealment."

The difference between that case and this is, that there the legality of the order depended mainly upon a question of fact, while here it depends upon a question of law. But the reasoning of the court is equally applicable to both, for the same disasters and disorders may be expected. if subordinates and soldiers are allowed to disobey the orders of their superiors upon a difference of opinion upon a question of law. Again. how often would this difference of opinion be a mere pretext to escape the demands of duty? In the war of 1812. the constitutional scruples of the militia men, as to the power of the president to order them out of the United States, led to their refusing to march across the Canada line to the aid of the regulars, when the latter were seriously engaged with the enemy, and thus a well planned enterprise failed, with serious loss to the American forces.

Nor is it necessary to the ends of justice that the subordinate or soldier should be responsible for obedience to the illegal order of a superior. In any case, the party injured can have but one satisfaction, and that may and should be obtained from the really responsible party—the officer who gave the illegal order. I am aware that in civil life the rule is well settled otherwise, and that a person committing an illegal act cannot justify his conduct upon the ground of a command from another. But the circumstances

of the two cases are entirely different. In the latter case, the party giving the command and the one obeying it are equal in the eye of the law. The latter does not act upon compulsion. He is a free agent, and at liberty to exercise his judgment in the premises.

Personal responsibility should be commensurate with freedom of action—to do or refrain from doing. For acts done under what is deemed compulsion or duress, the law holds no one liable. In contemplation of law, the wife is under the power and authority of the husband. Therefore, for even criminal acts, when done in the presence of the latter, she is not held responsible. The law presumes that she acted under coercion of her husband, and excuses her.

If the law excuses the wife on the presumption of coercion, for what reason should it refuse a like protection to the subordinate and soldier when acting in obedience to the command of his lawful superior? The latter may be said to act—particularly in time of war—under actual coercion. As a matter of abstract law, it may be admitted, that ultimately the law will justify a refusal to obey an illegal order. But this involves litigation and controversy alike injurious to the best interests of the inferior, and the efficiency of the public service. The certain vexation and annoyance, together with the risk of professional disgrace and punishment which usually attend the disobedience of orders by an inferior, may safely be deemed sufficient to constrain his judgment and action, and to excuse him for yielding obedience to those upon whom the law has devolved both the duty and responsibility of controlling his conduct in the premises. True, cases can be imagined, where the order is so palpably atrocious as well as illegal, that one must instinctively feel that it ought not to be obeyed, by whomever given. But there is no rule without its exception. This one is practical and just, and the possibility of extreme cases ought not to prevent its recognition and application by the courts.

Between an order plainly legal and one palpably otherwise—particularly in time of war—there is a wide middle ground, where the ultimate legality and propriety of orders depends or may depend upon circumstances and conditions of which it cannot be expected that the inferior is informed or advised. In such cases, justice to the subordinate demands, and the necessities and efficiency of the public service require, that the order of the superior should protect the inferior; leaving the responsibility to rest where it properly belongs—upon the officer who gave the command.

The all important question in this case yet remains to be considered.

The defendants maintain that the acts complained of in this action are within the purview of the act of congress, entitled "An act relating to habeas corpus, and regulating judicial proceedings in certain cases," approved March 3, 1863 [12 Stat. 755], and the act supplementary thereof, approved May 11, 1866 [14. Stat. 46], and that these acts furnish a complete defense to this action.

On the other hand, it is contended for the plaintiff, that the acts of the defendants are not within the purview of these statutes, and that each of said statutes, in so far as they purport to indemnify officers and soldiers for an arrest or imprisonment made during the suspension of the habeas corpus, by the president in pursuance thereof, is unconstitutional and therefore void.

A question of greater importance, both to the government and the citizen—to the maintenance of the authority of the people on the one hand, and the preservation of individual liberty on the other,—was probably never submitted to the determination of a court. Without further apology or preface, and without fear, favor, or affection, I proceed to examine and decide it.

Const. art. 1, § 9, subd. 2, declares: "The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public service may require it." And also (article 1, § 8, subd. 19), that: "The congress shall have power, . . . . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof."

By section 1 of the act of March 3, 1863, congress authorized the president, during the rebellion, "to suspend the privilege of the writ of habeas corpus in any case, throughout the United States or any part thereof." The constitutionality of the section must be admitted without argument. The clause of the constitution first quoted is a recognition of this power in congress, as well as a limitation upon its exercise, to the occasions, "when," by reason of the existence of "rebellion or invasion, the public service may require it." When the occasion arises—a rebellion or invasion—whether "the public service" requires the suspension of the writ or not, is confided to the judgment of congress, and their action in the premises is conclusive upon all courts and persons. Ex parte Merryman [Case No. 9,487]; 2 Story, Const. § 1342. In the exercise of this power, congress may suspend the writ generally, or may limit the suspension to particular cases. They may suspend the writ directly, or commit the matter, within the properly described limits, to the judgment of the president.

Section 4 of the act of March 3, 1863, enacts: "That any order of the president, or under his authority, made at any time during the existence of the present rebellion, shall be a defense in all courts to any action or prosecution, civil or criminal, pending or to be commenced, for any search, seizure, arrest, or imprisonment, made, done, or committed, or acts omitted to be done, under and by

virtue of such order, or under color of any law of congress; and such defense may be made by special plea or under the general issue."

On September 15, 1863 [13 Stat. 734], the president, in pursuance of the authority conferred upon him by section 1 of the act of March 3, 1863. issued a proclamation, wherein it was declared that "the public safety does require that the privilege of the said writ" (of habeas corpus) "shall now be suspended throughout the United States in the cases where, by the authority of the president of the United States, military, naval, and civil officers of the United States, or any of them, hold persons under their command or in their custody, either as prisoners of war, spies, or aiders or abettors of the enemy, or officers, soldiers, or seamen enrolled or drafted or mustered or enlisted in or belonging to the land or naval forces of the United States, or as deserters therefrom, or otherwise amenable to military law or the rules and articles of war or the rules or regulations prescribed for the military or naval services by authority of the president of the United States, or for resisting a draft, or for any other offense against the military or naval service:

"Now, therefore, I, Abraham Lincoln, president of the United States, do hereby proclaim and make known to all whom it may concern, that the privilege of the writ of habeas corpus is suspended throughout the United States, in the several cases before mentioned, and that this suspension will continue throughout the duration of the said rebellion, or until this proclamation shall, by a subsequent one to be issued by the president of the United States, be modified or revoked."

Section 1 of the act of May 11, 1866 [14 Stat. 46], enacts: "That any search, seizure, arrest, or imprisonment made, or any acts done or omitted to be done during the said rebellion, by any officer or person, under and by virtue of any order, written or verbal, general or special, issued by the president or secretary of war, or by any military officer of the United States holding the command of the department, district, or place within which such seizure, search, arrest or imprisonment was made, done or committed, or any acts were so done, or omitted to be done, either by the person or officer to whom the order was addressed, or for whom it was intended, or by any other person aiding or assisting him therein, shall be held, and are hereby declared, to come within the purview of the act to which this is amendatory, and within the purview of the fourth . . . section of the said act of March 3, 1863, for all the purposes of defense . . . . provided therein. But no such order shall, by force of this act, or the act to which this is an amendment, be a defense to any suit or action for any act done or omitted to be done after the passage of this act."

Admitting the constitutional power of congress to suspend the privilege of the writ of habeas corpus, as was done by the act of March 3, 1863, can they in any case go further, and pass acts to indemnify or protect persons, who without legal cause or warrant, have been instrumental in imprisoning others, during such suspension?

Before answering this question, it is well to consider what is the purpose and practical effect of suspending the privilege of the writ. Personal liberty, unless forfeited by due course of law, is the right of every citizen of the republic. The writ of habeas corpus is the remedy by which a party is enabled to obtain deliverance from a false imprisonment. Ordinarily, every one imprisoned without legal cause or warrant is entitled to this remedy—this privilege. The power to suspend this privilege includes, and is in fact identical, with the power to take away or withhold this remedy from the individual during the period of such suspension. The suspension of the privilege of the writ and the denial of the remedy for false imprisonment are indentical in effect, if not in terms. It follows that the power of congress to suspend the privilege of the writ of habeas corpus is equivalent to the power to take away from all persons, during the suspension, the right to the ordinary and only remedy for deliverance from false imprisonment. This is the effect of the suspension. What is the purpose of it —the object to be accomplished by it? The occasion and necessity to which the constitution limits the power of suspension clearly denote the purpose and end for which the suspension is made. The occasion is the existence of "rebellion or invasion," and the necessity is the fact that "the public service"— safety, requires it. The public safety is the end to be secured or obtained by the suspension. The danger to the public safety arises from the "rebellion or invasion;" and the writ is suspended to enable the executive to prevent harm to the republic from those who are or may be suspected of assisting the cause of the "rebellion or invasion." The suspension enables the executive, without interference from the courts or the law, to arrest and imprison persons against whom no legal crime can be proved, but who may, nevertheless, be effectively engaged in forming the rebellion or inviting the invasion, to the imminent danger of the public safety.

Plainly expressed, the suspension of the privilege of the writ is an express permission and direction from congress to the executive, to arrest and imprison all persons for the time being, whom he has reason to believe or suspect of intention or conduct, in relation to the rebellion or invasion, which is or may be dangerous to the common weal.

That at the time of the formation and adoption of the constitution, such was the understanding, as to the purpose and practical effect of suspending the privilege of the writ, is apparent from the elementary com-

mon law treatises of the time. Blackstone, in his Commentaries (book 1, p. 136), says: "Of great importance to the public is this personal liberty; for if once it were left in the power of any, the highest magistrate, to imprison arbitrarily whoever he or his officers thought proper (as in France it is daily practiced by the crown), there would soon be an end of all other rights and immunities. Some have thought that unjust attacks, even upon life or property, at the arbitrary will of the magistrate, are less dangerous to the commonwealth than such as are made upon the personal liberty of the subject. To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government. And yet sometimes, when the state is in great danger, even this may be a necessary measure. But the happiness of our constitution, is that it is not left to the executive power to determine when the danger of the state is so great as to render this measure expedient; for it is the parliament only, or legislative power, that, whenever it sees proper, can authorize the crown by suspending the habeas corpus act for a short and limited term, to imprison suspected persons without giving any reason for so doing, as the senate of Rome was wont to have recourse to a dictator, a magistrate of absolute authority, when they judged the republic in any imminent danger. . . . In like manner, this experiment ought only to be tried in cases of extreme emergency; and in these the nation parts with its liberty for a while, in order to preserve it forever."

It is evident, from the language of this passage, that the commentator was not disposed to undervalue the importance of personal liberty, nor to overstate the purpose and practical effect of the suspension of the habeas corpus act.

At the era of the constitution, this was the acknowledged doctrine of the common law concerning personal liberty and the suspension of the privilege of the writ, whereby that liberty was left at the discretion of the government for the time being. The provision in our constitution was adopted with that understanding of its effect. It in no wise changed the common law as laid down by Blackstone, except that, instead of leaving congress at liberty to suspend the privilege "whenever it sees proper," it limited and confined the exercise of such power to times of "rebellion and invasion."

This is also evident, from the nature of things. If the suspension of the privilege of the writ is not intended to authorize and permit arrests without the ordinary legal cause

or warrant, for what is it intended? The very limitation in the constitution upon the power of suspension is strong evidence that it was not understood to be a mere form, but something of serious import and effect. An arrest upon a warrant describing an offense defined by law, can be made and maintained, with the privilege of the writ in force. Unless the suspension changes the law, so to speak, for the time being, in regard to arrests and imprisonments, I am at a loss to conceive how the republic can be thereby preserved from imminent danger, or the public safety conserved. The powers granted to congress must be construed and applied with reference to the purposes for which the constitution was made. It is not a mere abstraction to sharpen men's wits upon, but a practical scheme of a government, having all necessary power to maintain its existence and authority during peace and war, rebellion or invasion. As was well said long ago, "The instrument was not intended as a thesis for the logician to exercise his ingenuity on. It ought to be construed with plain good sense. The uniform sense of congress and the country furnishes better evidence of the true interpretation of the constitution than the most refined and subtle arguments."

The purpose of the express power to suspend the privilege of the writ of habeas corpus—the object to be obtained being to authorize, for the time being, the imprisonment of persons "without giving any reason for so doing," and without legal cause or warrant, as a means of preserving the republic from imminent danger, it follows as a necessary consequence, that, under the clause giving power "to make all laws which shall be necessary and proper for carrying into execution" the power of suspension, congress may pass any law necessary and proper to secure or obtain this end, unless expressly prohibited therefrom by the constitution itself.

Without further legislation than the suspension of the privilege of the writ, every person imprisoned without legal cause or warrant, might maintain an action for damages therefor. To enable the power of suspension to be executed—the purpose of it to be accomplished—it becomes necessary to provide in some way for the protection of the officers and persons required to make arrests and imprisonments. To accomplish this, congress has passed the indemnity clauses in the acts of March 3, 1863, and May 11, 1866, being section 4 of the one act and section 1 of the other. Were these provisions in these acts necessary and proper means to secure the end in question? Let the supreme court answer the question. In McCullough v. State [4 Wheat. (17 U. S.) 415], Chief Justice Marshall says: "The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers, to insure, as far as human prudence could insure, their beneficial execution. This

could not be done by confiding the choice of means to such narrow limits as not to leave it in the power of congress to adopt any which might be appropriate, and which were conducive to the end. This provision is made in a constitution intended to endure for ages to come, and consequently to be adapted to the various crises of human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change entirely the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can best be provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances." [McCullough v. State] 4 Wheat. [17 U. S.] 415. And again: "We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." Id. 421.

It is not necessary to repeat what has been said to show the legitimacy of the end proposed by congress in this legislation. Waiving the question of the propriety of the means for the moment, if this end is not legitimate, then the clause in the constitution authorizing the suspension of the privilege of the writ is merely nugatory, and the power might as well have been absolutely denied.

As has been shown, the power to suspend the habeas corpus, in the cases specified, being practically the power to authorize and provide for the imprisonment of persons for the time being without legal cause or warrant, and "without giving any reason for so doing," it must follow, that to secure this end, congress must have power to protect or indemnify the officers and persons whom, mediately or immediately, it thus requires to do any act concerning such imprisonments.

The argument for the plaintiff may be briefly stated thus: "The suspension of the writ 'creates a despotism,' and therefore the end is not legitimate." Let it be admitted, for the purposes of argument, that the suspension does "create a despotism." What

then? Does the conclusion follow? By no means; because, as we have seen, the constitution expressly authorizes the suspension, and history teaches, and so the fathers understood it, that such suspension was allowed, so as to authorize and permit imprisonments without the ordinary cause or process, for the safety of the republic.

Such an argument might have been proper as against the adoption of the constitution by the people, but in a court which must recognize that instrument—the suspending clause inclusive—as the supreme law of the land, it becomes a mere waste of opprobrious epithets.

Nor does this power as now construed merit such epithets. A despotism in any sense or form always implies the idea of irresponsible as well as unlimited power. The people of the United States made the constitution for themselves, and can change it when they will, to suit their altered condition or change of opinions. While yielding obedience to their government, exercising the powers conferred by that instrument, whether ordinary or extraordinary, they cannot be said to be living under a despotism. When their representatives in congress assembled, suspended the privilege of the writ of habeas corpus for the public safety, they only exercised a delegated power, for the proper use of which they are responsible to their constituents at short intervals. To call such a state of things a despotism is an abuse of language and a confusion of ideas. At most, it is but a voluntary and temporary surrender by the people of the ordinary safeguards of personal liberty in an "extreme emergency," whereby, as Blackstone says, "the nation parts with its liberty for a while, in order to preserve it forever."

As a means to secure the purpose and practical end of suspending the privilege of this writ, does the constitution anywhere prohibit congress from passing the laws in question? He who asserts that it does, must show it. I have been unable to find such a provision, and the counsel for the plaintiff, notwithstanding his learning and zeal, has failed to point it out.

It is not enough to show that the constitution prohibits unreasonable searches and seizures, and the issuing of warrants without probable cause, supported by oath or affirmation. These provisions of the constitution are qualified by the express power to suspend the privilege of the writ. The former furnish the general rule, while the latter takes effect in the excepted case of public danger in time of rebellion or invasion.

But these indemnity laws do not conflict with the constitution in any of these provisions. They do not authorize any imprisonment with or without cause, but are enacted to protect an officer or person from an action for damages, on account of acts done in the defense of the public safety during the suspension of the writ, for imprisonments

already made in pursuance of a law authorized by the constitution.

It is admitted that the legislature of a state, by virtue of its general legislative power, unless specially prohibited therefrom, could pass laws barring the right of any of its citizens to maintain an action for an alleged assault and battery or false imprisonment. In the choice of means to carry out an express power, as the suspension of the writ, congress may also exercise its discretion, and adopt any measure not specially prohibited by the constitution. These means are necessarily the passage of laws, and one of the most appropriate for the purpose is to provide that the officer shall not be liable to an action. Another, and probably the only other, is to provide by law for the payment out of the public treasury of all judgments that may be recovered against officers by reason of any act done by them pending the suspension of the writ, and in pursuance of the law authorizing or providing for such suspension. But congress may adopt either of these means, as they may deem best. The constitution commits the choice of means to them, and their decision in that respect is conclusive. In England, as I am advised, it has always been the practice to pass indemnifying acts to protect the executive officers from actions for damages, on occasion of suspending the habeas corpus act. 1 Wend. Bl. 137, note.

But I am inclined to put the decision of this question upon higher and simpler grounds. It appears to me that these acts of congress are merely declaratory of the law, as it resulted from the passage of the act suspending the privilege of the writ, and therefore necessarily constitutional. The suspension being the virtual authorization of arrest without the ordinary legal cause or warrant, it follows that such arrests, pending the suspension, and when made in obedience to the order or authority of the officer to whom that power is committed, are practically legal. They are made in pursuance of law—the law suspending the privilege of the writ. The municipal law declares in advance that homicide is justifiable when committed by an officer in obedience to the judgment of a competent court. In the absence of such a statute provision, what court would hold that such a homicide was illegal and criminal? It seems to result from the nature of things, that what the law commands or permits, so far as the law is concerned, is legal and justifiable.

It only remains to determine whether the defendants are within the provision of the indemnifying acts. If they are, judgment must be given in bar of the action, and if not it must go against them for the damages found.

Section 4 of the act of March 3, 1863, makes any order or authority of the president, made at any time during the existence of the present rebellion, a defense to any action for arrest and imprisonment, made under and by virtue of such order.

In the case at bar, no authority or order of the president is shown for the imprisonment of the plaintiff. It is the order or authority of the president which the act makes a defense to the action. Such order or authority cannot be presumed, but must be proved.

Counsel for the defendants seek to invoke the proclamation of September 24, 1862 [13 Stat. 735], in aid of the defendants in this respect. It may be admitted generally that a proclamation by the president is an order or authority to all whom it may concern or to whom it may be addressed. Is this proclamation within the act of March 3, 1863?

The act declares that "any order of the president . . . made at any time during the existence of the present rebellion, shall be a defense, etc." Does this include orders made during the existence of the rebellion—as the proclamation of September 24, 1862—but prior to the date of the enactment? It must be admitted that the language of the statute, taken literally, is broad enough for that purpose. But I do not think it was so intended or should be so construed, and for this reason: Congress was by that act first authorizing the suspension of the privilege of the writ of habeas corpus. It was only as an appropriate means to this end that congress could have made such orders a defense to an action for imprisonment. Where an act of congress is equally susceptible of two constructions, the court is bound to adopt that one which will make the act harmonize with the constitution.

But, if I am mistaken in this, there is another answer to the proposition that the proclamation is a defense to the action. That proclamation professes to suspend the writ of habeas corpus and to declare martial law. The expression martial law may be passed over as merely cumulative. It means nothing but the absence of law. But the president of the United States has no authority to suspend the privilege of the writ, except as authorized and directed by congress, and at the date of this proclamation no such authority existed. I do not propose to argue the question. There are some things too plain for argument, and one of these is, that by the constitution of the United States the president has not the power to suspend the privilege of the writ, and that congress has. The power of the president is executive power—a power to execute the laws, but not to suspend them. The latter is a legislative function, and so far as it exists, belongs naturally and by force of the constitution exclusively to congress. See opinion of Chief Justice Taney, in Ex parte Merryman [Case No. 9,487], and authorities there cited.

Whatever may have been the public necessities and motives which led the president to

issue this proclamation—and I neither question nor impugn them—I cannot hold that it constitutes a defense to this action, because judicially I know that it was unauthorized and void.

Except as a means to secure the end and purpose of suspending the writ, congress itself could not have authorized the president to make this proclamation, nor do I think they could afterwards sanction it, so as to make it operate as a defense in a private action for an imprisonment made under it.

What is now said applies only to this action or similar ones. The proclamation of September 24, 1862, embraces many subjects and classes of persons. As to some of them or many of them, the president may have been authorized as commander-in-chief of the army and navy, to make the orders and directions therein. It declared that all rebels and insurgents, their aiders and abettors within the United States, and all persons discouraging volunteer enlistments, resisting militia drafts, or guilty of any disloyal practice, affording aid and comfort to rebels against the authority of the United States, shall be "subject to martial law and liable to trial and punishment by courts martial or military commissions." "The writ of habeas corpus is suspended in respect to all persons arrested, or who are now, or hereafter during the rebellion shall be imprisoned in any fort, camp, arsenal, military prison, or other place of confinement by any military authority or by the sentence of any court martial or military commission."

But if it were admitted that this proclamation was authorized by law, and that it contained sufficient matter to justify the defendant McDowell in causing the arrest of the plaintiff as he did, still I do not think it would be a defense to this action, because long before this arrest, it was superseded and practically revoked by the proclamation of September 15, 1863—the one authorized by the act of March 3, 1863.

The latter carefully defines the class of persons in relation to which the privilege of the writ was thereby suspended, and who might therefore be arrested and imprisoned without legal warrant or cause. In the absence of particular proof the only general order that the court can take judicial notice of is the proclamation of September 15, 1863. In this I do not find any order directing the arrest of the plaintiff, or that would justify his arrest. It is true that the proclamation suspends the writ as to "aiders and abettors of the enemy." And it is apparent that this language was intended to apply to and include a class of persons whose conduct fell short of that "aid and comfort" to the enemy, which the constitution declares to be treason, and which is legally punishable as such.

It is this class of persons that the suspension of the writ is intended to bring within the power of arbitrary arrest for the time being—persons who may be reasonably suspected of complicity with the rebellion or invasion, or who may be known to give it that moral aid and support which is often more effectual than a soldier in arms, particularly in a country governed by public opinion. But while the proclamation suspends the privilege of the writ as to such "aiders and abettors" as a class, does it authorize or order any officer, military or civil, to arrest and imprison any particular person whom he may believe to be such an "aider or abettor," without the special and further order or authority of the president for so doing? I think not.

The language of the proclamation is, that, "in the judgment of the president, the public safety does require that the privilege of the said writ shall be suspended throughout the United States in the cases where by the authority of the president of the United States, military, naval, and civil officers of the United States, or any of them, hold persons under their command or in their custody, either as prisoners of war, spies, or aiders or abettors of the enemy, etc." This proclamation is in the nature of a law—it has the force of a law—and by it an important provision of the constitution is suspended. It should then be construed and treated as a law—a rule of action. It prescribes the limits within which the writ shall be suspended. As to any of the persons included within these limits, when in the custody of an officer of the United States, by the authority of the president, the privilege of the writ is taken away. But I do not see how a person can be said to be in the custody of an officer by authority of the president, unless the latter has directed or ordered the officer to take him into custody or to keep him in custody after having been arrested in any way. I admit that there is some room for argument upon the language of the proclamation, as to whether the instrument itself is to be construed as a general order to every officer of the United States, military, naval, and civil, high or low, great or small, to arrest and imprison whomsoever they may believe to be "aiders and abettors of the enemy," or merely a declaration in advance, that whenever such a person is arrested or kept in custody by such officer, upon the order of the president —not the order of the subordinate—that as to him the privilege of the writ is suspended. But I think the latter construction altogether the most reasonable, and in accordance with the general spirit and purpose of the instrument. So upon general considerations outside of the language of the proclamation, there are many cogent reasons why it should be thus construed and applied. The power of arbitrary arrest and imprisonment, though sometimes absolutely necessary to the public safety, is a dangerous and delicate one. In the hands of im-

proper persons it would be liable to great abuse. If every officer in the United States, during the suspension of the habeas corpus, is authorized to arrest and imprison whom he will, as "aiders and abettors of the enemy," without further orders from the president, or those to whom he has specially committed such authority, the state of things that would follow can be better imagined than expressed.

It only remains to consider what is the effect of section 1 of the act of May 11, 1866. That act, as we have seen, makes the order of "the president or secretary of war," or of "any military officer of the United States holding the command of the department, district, or place within which" an "arrest or imprisonment was made," a defense to the action.

Under this section there can be no doubt but that the order of General McDowell to Captain Douglas protects the latter for acting in obedience to it, and is a complete defense to the action, so far as he is concerned.

At the same time it is equally apparent that it does not furnish a defense for General McDowell. He is not shown to have acted upon the order of any one. The section proceeds upon the principle, which I have already attempted to show ought to be the law independent of the statute, that a military officer, when acting in obedience to the order of his superior, should not be liable to these persons therefor.

As it nowhere appears that General McDowell was acting under the order of his superior, but rather in obedience to what was deemed public necessity, I must hold him liable to the plaintiff for the damages which the latter has sustained by reason of his unauthorized act.

The good motives of General McDowell, and the necessities of the public, when he issued order No. 27, as well as the gross misconduct of the plaintiff, have been duly considered by the court in estimating the damages of the plaintiff. But these alone, however worthy or imperative, do not constitute a defense to the action. The act itself being unauthorized by any order or authority of the president, does not come within the scope of the proclamation of September 15, 1863, suspending the privilege of the writ, or the act of March 3, 1863, authorizing such suspension. Neither does it come within the province of the act of May 11, 1866, as it was not done in obedience to the order of a superior.

Congress may relieve a meritorious officer against a loss incurred while in the discharge of his duty to the public; but in this tribunal, whose only function is to administer the law, the defendant must be held liable for the legal consequences of his act.

Judgment, that the plaintiff recover of the defendant, McDowell, the damages found by the court, and his costs and disbursements, and in bar of the action as against the defendant, Douglas.

[Afterwards a motion for a new trial was argued before Justice FIELD and Judge HOFFMAN; and was denied.] [1]