Statement of the Case.
NICHOLLS, J.
The plaintiff prays for a judgment in his favor against the defendant for this: That the New Orleans Railways Company is a corporation doing business in this city as operator of street cars.
That on February 15, 1904, between the hours of 10 and half past 10 o’clock p. m., he was a passenger on car No. 253 of the Clio street line of cars operated by the defendant corporation then in charge of Conductor Jules Mossy; that petitioner had paid his fare on entering the car at the intersection of Royal and Orleans streets and was peaceably riding on said car to his intended destination, namely, 2230 Clio street, when, at the intersection of Canal and Royal streets, the said Conductor Jules Mossy, while acting as the agent of the defendant corporation and within the scope of his employment and with the intention of carrying out the instructions given him by said defendant corporation and its officers or agents superior to him and of performing his duty of protecting the passengers -on said car, as he thought, did call Police Officer Methe and two other police officers of the local police force, who entered from the rear and front of said ear, and then and there, in the presence of a car load of passengers, unceremoniously and without reason or cause did eject petitioner from said car and order said police officers to remove petitioner from said car and arrest him as a pickpocket.
That the said conductor, in the presence of all the passengers, charged petitioner *314 with being one of the pickpockets who escaped from his car a few evenings before, and, by persisting in the statement and not permitting petitioner to explain, that he (the conductor) was making a mistake, and, by instructing said police officers to arrest petitioner as the pickpocket who had escaped from his ear, humiliated petitioner.
That thereupon, at the instance of said conductor, whilst acting as aforesaid, he was removed from the car (although his intended destination was 2230 Clio street, though he remonstrated), and was walked through Royal street from Canal to Customhouse, now called Iberville, street, followed by a large and inquisitive gathering, tothe patrol box at the corner of Iberville street and Exchange alley, where he was compelled to stand and be gazed upon and inquired about by a large gathering of citizens until the arrival of the police patrol wagon, when he was ignominiously placed in said wagon like a common felon, in the presence of the aforesaid gathering, amongst which were many of his acquaintances, and driven to the Third precinct police station, when, after being questioned by the captain in charge, and upon the remonstrance and representations of several of his friends who had witnessed the outrages heaped upon Mm and who followed him to the station house to protest against such treatment, he was allowed to depart without even a charge being preferred against him.
That all this happened on the night before Mardi Gras just after the Proteus parade, at a time when both Canal and Royal streets, as well as Iberville street and Exchange alley, were unusually crowded with residents of and visitors to this city; that a vast throng witnessed his arrest, greatly to his chagrin and humiliation, and that the mental agony and mental and bodily suffering of petitioner whilst being escorted by the police officers through the streets as a pickpocket were indescribable, and that he was equally tortured and humiliated by the gross, wanton, and uncalled for insult and abuse heaped upon him as aforesaid by said conductor whilst acting within the scope of his duties and instructions, on said ear, as the agent of said defendant corporation.
That he has made amicable demand upon said defendant corporation for reparation and for the amount herein sued for as damages, without avail; that he has suffered damages in said sum for injury to his feelings, humiliation, mental and bodily agony, and suffering, loss of reputation and time, and chagrin.
That he was born in New York City 25 years ago, and has been a resident of this city continuously for the past 8 years; that he has always borne an excellent reputation for honesty and as a respectable and peaceable citizen; that the outrageous treatment to which he has been subjected by reason of the fault of said defendant corporation’s agent has preyed upon his mind to such an extent that he has never been the same in health or spirits since the occurrence of the outrage.
In view of the premises petitioner prays that said New Orleans Railways Company be cited according to law; and that after due proceedings had there be judgment in favor of petitioner and against said New Orleans Railways Company in the full sum of $5,000, with legal interest from judicial demand, for costs and general relief.
Defendant answered, pleading the general issue.
The court rendered judgment in favor of the plaintiff, in the-sum of $750, with interest from date of judgment.
Defendant appealed.
Plaintiff answered the appeal, praying for an increase in the judgment to the amount prayed for.
*316 Opinion.
The testimony adduced on the trial of this case established beyond the possibility of a doubt that about 10 o’clock on the night of February 15, 1904, the plaintiff entered on Royal street at the corner of Orleans, as a passenger on car No. 61 of the Olio street line of cars, owned and operated by the defendant company, for the purpose of going to his home on Olio street; that he paid his fare as a passenger; that while thus upon the car he was guilty of no wrong or fault; that when the car reached the corner of Royal and Canal streets a policeman entered the car, arrested him, and took him off the car in the presence of a large number of passengers, placed him under arrest, and, followed by a large crowd, carried him to the corner of Exchange alley and Iberville (Customhouse) streets, from which place the officer sent him in a patrol wagon to the police station, opposite Jackson Square, where he remained until 1 o’clock at night. At that time he was released, without any charge being brought against him; it having been shown to the satisfaction of the officers of police that the arrest which had been made was the result of mistaken identity. The plaintiff is shown to have been a man of good character, standing, and position, and was necessarily greatly mortified and humiliated by the treatment he received.
The occurrence took place on the night before Mardi Gras. At that season the city is filled with strangers seeking pleasure, who are accompanied or followed usually by numbers of thieves and pickpockets endeavoring to take advantage of the crowded streets and cars to ply their illegal practices.
It seems that, upon a report made by the conductor of the car No. 61 of the Olio street line to the inspector of the company, Winters, that several evenings before several of these pickpockets had entered upon his car, the inspector called up some of the police officers by telephone, communicated to them the information he had so received, and directed them to place themselves in communication with the conductors; which accordingly they did. Upon the information thus received, ■ Detectives Schultz and Reynolds entered several days later in citizens’ dress into the car, and upon a nod from the conductor they arose and went to the front of the car, where several pickpockets who were aboard the car took alarm; one ran to the front platform and jumped over the dashboard, followed by Detective .Schultz, who, however, failed to arrest the man.
The arrest made on the night of the 15th of February seems to have been a sequence of that just referred to and of the informa-' tion of the situation of affairs which had been brought to the notice of the police. When car No. 61 stopped that night at the corner of Royal and Canal streets, there were several policemen standing in the immediate neighborhood, among others, Policeman Methe, who arrested the plaintiff. The following is his version of what took place: He was stationed at the corner of Royal and Canal streets. “The conductor of car No. 61 of the Clio street line says to me: ‘Officer, here’s a ¡pickpocket on the car.’ I went through the front of the car, and he points the man out. I got the man. I took him out of the car. While I was taking the man out several gentlemen whom I knew by sight said, ‘The conductor is mistaken; and I was in doubts, so I took the man down to Exchange alley and Customhouse street and rang the wagon, and several more gentlemen came there and told me they knew the ¡ man; knew him to be a respectable sort oí 1 person. So the wagon came, and I did not 1 want to put myself into it. I held the man [ subject to the captain’s orders. Captain 1 Walsh, the commander of the precinct, when he got to the station, released the man. * * * The conductor told me there was a pickpocket in the car, and he *318 pointed, the 'man (Sir. Schmidt) out to me ;and said he was a pickpocket; that’s the words he used. He didn’t order me to arrest him, but he told me he was a pickpocket, and naturally it was my duty to arrest such people as these. He said: ‘Its the same man who jumped off the car a couple of ■nights before when Detectives Schultz and Reynolds were in the car.’ I was near him when he said it. We were right close together. The car was very crowded. This happened inside the car. The attention of the people in the car was attracted to the remark. There was a stampede in the car .at the time. Everybody was excited, and ■everybody wanted to look at him, and naturally a policeman coming in the ear made some excitement. There was a crowd in the ■street when I took Mr. Schmidt off. There was a crowd all night there. * * * When I put my hands on Mr. Schmidt and arrested him he was surprised. He said: ‘These people are mistaken; you are making a mistake.’ ”
The plaintiff Schmidt testified that he rode ■on the car as far as Canal street, when he was taken off the ear by a policeman. There was one at the front door and one at the rear, and they took him off the car. He was wondering why, so he went to the front of the car and asked the conductor why he put him off. He looked at him awhile and then said: “Ain’t you the man who jumped oft the dashboard of this car the other night?” It was not long after that the car went off, the policeman took him down to Exchange alley and Customhouse street, and from there took him in the patrol wagon to the ■station. “The conductor said to the policeman: ‘That’s the man back there.’ The policeman took the man back of me first, and the conductor said: ‘Not him; the first one’ ” —■pointing to Schmidt himself. The policeman then took him off the car, and he walked with the policeman to the front of the car. The conductor was there with the motorman, and he asked him (Schmidt) whether he was not the man who had jumped over the dashboard the other night. There was a large crowd there. The attention of the passengers was attracted to the excitement. They saw the arrest. The whole crowd saw the conductor point him out to the policeman. The conductor said to the policeman: “Detective Schultz will know him.”
The evidence shows that the officer Methe took plaintiff out of the rear end of the car and took him on the outside to the front of the car.
Mr. Abraham Beer testified that he was, at the time of the occurrence, at the corner of Royal street. He saw a car come up there and stop; the conductor saying that Mr. Schmidt was a pickpocket. “I heard him tell that to somebody. I saw the conductor tell the policeman, ‘That’s the man,’ pointing to Mr. Schmidt. Mr. Schmidt and the conductor were on the back platform.”
The witness Gillis testified that the policeman, after taking Schmit from the rear end of the car, brought him to the front to the conductor, who was at that end. Mr. Schmidt wanted to know what was the matter with him, and the conductor said: “Ain’t you the man who jumped off the dashboard the other night?” Mr. Schmidt said he was not, and some one (witness did not know who) said: “They will know all right.” When Mr. Schmidt was arrested he said he was not guilty of any crime and would make them pay for putting him to that trouble and disgrace.
The defendant placed its inspector, Mr. Winters, on the stand, also Mossy, the conductor of car No. 61, and its second vice president, Joseph H. De Grange.
The former testified that Conductor Mossy had made complaint to him of larcenies committed on his car by pickpockets entering the same. He told the conductor he would take the information and give it to the po *320 lice department. He accordingly rang them up by telephone, and they sent Detectives Schultz and Reynolds over to see him. He told them exactly what the conductor had told him. He told them to go and see the conductor. He did not give any instructions to the conductor or to any one else to arrest the men on the cars. The railways company did not give such instructions. The witness simply reported the matter to the police and left it to them to act. Witness did not tell the conductor to receive instructions from the police. He told him he would give the information to the police. Witness has no right to give instructions to the police department. They thanked him for the information. Witness asked them to go and see the conductor and get from him the information which he himself had received from him. He did this because there had been lots of complaints made in reference to thieves in the ears, and he thought it was no more than right that the company should protect the patrons of the street cars. He considered it was the duty of the company to protect the passengers against pickpockets by giving the information received to the police.
The inspectors were not instructed in particular in all such details, but he considered that the company owed the people of the city, if anything was wrong on the cars, that information should be given to the police. He considered it was part of his duty to give such information to the police.
Mr. De Grange, a vice president of the company, testified that the defendant company had never given any instructions to its conductors or motormen in regard to the arrest of the suspected people on their cars. On the contrary, they were forbidden to do any police duty.
If the conductor and motorman on this or any other car caused the arrest of a suspected person, they would have been unauthorized to do so by the company. They would have done it in direct disobedience of orders, because they have no police powers and are not authorized to make any arrests. When there are suspected persons operating on the cars, the company, for the purpose of protecting its patrons, notifies the police, calls their attention that such information had reached them, and asks them to do whatever they see fit to do. He did not consider it was one of the duties of his company to protect its passengers against loss through manipulations of pickpockets on the cars. The company protected them as well as it possibly could. It was the duty of the conductors to see that passengers reached their destination safely, as far as they possibly could; but there were a great many contingencies that they were unable to control.
Detectives Schultz and Reynolds were placed upon the stand. They testified to the fact that they had received information from Mr. Winters, the inspector of the defendant company, that Conductor Mossy had made a report to him that there were pickpockets working on his car, and he referred them to the conductor. They called upon the latter on his car and were told by him about it. They testified in reference to the occurrence on that car when one of the pickpockets jumped over the dashboard of the car and escaped. They asked the conductor on that occasion, if he saw any of the pickpockets that he knew, to give them a little tip on the quiet. There was an agreement with him that he should notify them when these parties whom he took to be pickpockets would get on his cars. On that particular occasion, when the car got near Poydras street, the conductor nodded to them. Immediately several men ran out of the car and escaped, as before stated. They instructed the conductor to point out thereafter to the police any of those people.
Mossy testified to the same prior facts *322 which the detectives have testified to. Touching the arrest of Mr. Schmidt, he said that he did not know him, but thought when he came on the ear that he had seen him on the car with the three pickpockets who had escaped several nights before, and that he was one of them. He testified that on the night of plaintiff’s arrest his car was “jammed” with people, and he asked the police corporal whether there were any detectives around, and he answered: “No; why?” And he (witness) said to him: “I think I have one of the thieves on the car. I would like you to put a detective on the car.” The first thing, he opens the gate, walks in, and he says: “Is this one of the men?” Witness said, “I think so,” and “he lugged the man off.” Witness asked for a detective to watch the man. His purpose was to have the detective watch him and see if he did anything. He did not tell the policeman to arrest him. He had never received any instructions from Inspector Winters or any other of the officers of the company to make any arrest or cause the arrest of anybody on the ear. He never gave any instruction to arrest any one. Witness simply asked the police if there was a detective there in citizen’s clothes, so he might get on the car and see if the man he suspected did anything wrong.
Mr. Schmidt resembled one of the men from the size and everything else. I-Ie denied positively having, pointed out Mr. Schmidt to the policeman, saying, “Officer, here is a pickpocket in the car;” denied having made the statement that “Mr. Schultz would know;” denied having asked Mr. Schmidt whether “he was not one of the men who had jumped off the car,” or having spoken to him at all; denied having been at the front end of the car at all; denied having seen the officer arrest Mr. Schmidt. It was a police corporal who arrested him, not Officer Methe.
In the brief filed on behalf of the defendant it is urged that:
“The master is never liable for the willful and malicious acts of the servant committed outside of the scope of his employment. On such a state of facts, therefore, a master cannot be held responsible, where the servant makes or causes a false arrest or false imprisonment.” Citing A. & E. Enc. of Law, vol. 20, p. 174; 6 Ezch. 314; L. R. 5 C. P. 640; L. R. 2 Q. B. 534; 7 Exch. 36; L. R. 5 C. P. 445; 6 Canada Sup. Ct. 532; Little Rock Traction & Electric Co. v. Walker, 65 Ark. 144, 45 S. W. 57; Tolchester Beach Imp. Co. v. Steinmeier, 72 Md. 313, 20 Atl. 188, 8 L. R. A. 846; Carter v. Howe Mach. Co., 51 Md. 290; Barabasz v. Kabat, 86 Md. 23, 37 Atl. 720; Central Ry. Co. v. Brewer, 78 Md. 394, 28 Atl. 615, 27 L. R. A. 63; National Bank of Commerce v. Baker, 77 Md. 462, 26 Atl. 867; Mulligan v. Railway Co., 129 N. Y. 506, 29 N. E. 952, 14 L. R. A. 791, 26 Am. St. Rep. 539; also, Ware v. Barataria & L. Canal Co., 15 La. 169, 35 Am. Dec. 189; Gerber v. Viosca, 8 Rob. 150; Civ. Code, art. 2320; Williams v. Palace Car Co., 40 La. Ann. 87, 3 South. 631, 8 Am. St. Rep. 512; Dyer v. Reely, 28 La. Ann. 6; Lafitte v. Railroad Co., 43 La. Ann. 34, 8 South. 701, 12 L. R. A. 337; McDermott v. Am. Brewing Co., 105 La. 124, 29 South. 498, 52 L. R. A. 684, 83 Am. St. Rep. 225.
We do not think that the conductor was fm this case malicious. On the contrary, though acting erroneously, carelessly, and to the great injury of the plaintiff, his acts were in the line of the discharge of his duty to his employers and in their supposed interest, and not his own. The railway company by reason of its act of incorporation came under certain obligations for the safety and protection of the public and particularly of its passengers, and it had for that purpose-to act through employés for whose acts in that regard it assumed responsibility.
The conductor of the street car represented in this instance the street railway eompanyThe conlpany could not free itself from the-obligations referred to by failing to give its conductors full and proper instructions, or by restricting the limit and extent of their authority so as to disable them from properly performing duties which it was inherently necessary and essential they should have in order to carry out to the extent of legal re *324 quirements the functions of the position in which they were placed. It could not, by merely enjoining upon the conductors to perform their duties cautiously, prudently, and well, break the effect of their failure to comply with these injunctions, nor could it, by throwing its instructions in the form of prohibitory orders, alter the legal scope of their power, duties, and authority.
These are matters which it cannot lessen and make to fall below the limits affixed to the positions themselves by operations of the law itself.
The conductor in the case before us did not himself arrest the plaintiff, but it was through his instrumentality that the latter was arrested in, and ejected from, the car In •which he was a passenger, by a policeman, and taken to the police station through the streets in a patrol wagon as a prisoner. The conduct of the policeman was the direct and natural consequence of the course pursued by the conductor. Article 2324 of the Civil Code declares that he who causes another person to do an unlawful act or assists or encourages in the commission of it is answerable in solido with that person for the damage occasioned by that act. It was held in Dickson v. Waldron (Ind. Sup.) 35 N. E. 1, that, where a person selected and paid by the proprietor of a theater is, at the request of the latter, appointed a special policeman for that theater, and under the direction of the proprietor’s ticket agent makes a wrongful arrest, the proprietor will be liable.
We do not underrate the difficulties in which railroad companies are placed by the heavy responsibilities thrown upon them by the law, but these responsibilities they voluntarily assume as being compensated by the privileges conferred by the state. Being assumed, they must be met.
We are of the opinion that the judgment appealed from is correct, and it is hereby affirmed.