# CHARLESTON.

Comisky v. Norfolk & Western Railway Co. *et al.*

Submitted October 11, 1916.    Decided October 31, 1916.

1. False Imprisonment—*Persons Liable—Grounds for Detention—Nonpayment of Fare.*

    A carrier is chargeable in damages for the false imprisonment of an employee for nonpayment of fare, when he in good faith believes he is entitled to free transportation in virtue of the contract for service other than the operation of the carrier's trains, the imprisonment having resulted from an unlawful arrest made or caused by the conductor of its passenger train, based on the failure of the employee to pay fare when demanded. The proper remedy in such case is ejection, not arrest and imprisonment. (p. 150).

2. Same—*Persons Liable—Carriage of Passengers—Liability for Acts of Servants.*

    If there exists such continuity in time and circumstance between an unlawful arrest by the servants of the carrier and the subse-

quent discharge of the accused as to constitute one continuous unlawful act, the carrier is liable for the resultant consequences, where the original wrong was done by the agent while actually engaged in performing the duties assigned to him.   (p. 153).

3.  SAME—*Warrant—Validity.*

A warrant issued upon a complaint charging nonpayment of fare only, is a nullity.   (p. 152).

4.  SAME—*Actions—Admissibility of Evidence.*

While an arrest for one offense can not be justified by proof of another separate and distinct offense, though both are intimately associated in time and place, such proof may be received in mitigation of damages on the trial of an action for false imprisonment. (p. 156).

5.  CARRIERS—*Carriage of Passengers—Regulation—Passes.*

The act of congress to regulate commerce, approved February 4, 1887, and amended June 29, 1906, which in part provides that no common carrier subject to its provisions shall, directly or indirectly, issue or give any interstate free ticket, pass or transportation for passengers except to its employees, prescribing punishment alike against the carrier and passenger for violations thereof, and similar provisions contained in sections 6 and 7, ch. 9, acts 1913, contemplate and intend the joint participation of the carrier and passenger, either directly or indirectly, to constitute a violation thereof.   The act of one party alone will not suffice.   (p. 159).

Error to Circuit Court, Mercer County.

Action by James Comisky against the Norfolk & Western Railway Company.   Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*A. W. Reynolds,* for plaintiff in error.

*Geo. L. Dillard* and *Russell S. Ritz,* for defendant in error.

LYNCH, JUDGE:

In an action of trespass on the case for an alleged false imprisonment, James Comisky recovered the judgment to which this writ of error was awarded.   He was arrested October 15, 1914, while on defendant's passenger train on the evening run from Bluestone Junction to Bluefield.   For some months theretofore he had been and then was an employee

of the Norfolk & Western Railway Company, engaged in construction of its electric power plant located at that junction. He claimed the right to free transportation between the two stations as an incident of his employment. The exercise of that right depended only on an identification by the foreman in charge of the work or some of his assistants. Because Comisky had only partially performed the labor assigned him on that day, on account of illness he says, Wheeler, the foreman, informed Jennings, the conductor, through Belcher, the brakeman, that Comisky was not entitled as an employee to passage on the return trip that evening. With this information, Jennings approached Comisky and demanded of him payment of the usual fare, and, being refused, took him into custody.

Plaintiff now bases his right to transportation that evening, first, upon a check issued to the company's employees, and, second, upon a pass issued to Carmody or Stevenson, formerly co-employees with him, which he claims Jennings had theretofore deemed sufficient authority to allow passage on the train in his charge. The sole purpose of the check, however, was to identify the bearer as the employee entitled to the payment of the wages due him; and it does not appear whether Carmody or Stevenson was then on the train, or indeed was in the service of the company. It seems they were not. Hence, neither of these excuses furnished any colorable grounds for asserting the right claimed.

Without the payment of fare, plaintiff was not entitled to passage on defendant's train when not engaged in its service. Upon his refusal to pay when payment was demanded, the conductor lawfully could have ejected him from the train, providing no more force was used than was necessary to effect the removal. Indeed, it seems reasonably clear he entered into the car intending to obtain passage, with the knowledge that he had not right thereto except upon the condition of the employment, an employment he had that day abandoned. Whether he was sick or not, he did not secure the aid of a physician, that being the alleged object of quitting his labor that day. On the contrary, the only medicine obtained he procured in a Virginia saloon, by means of which he became intox-

icated. But, although subject to ejection for nonpayment of fare, or for any other cause justifying that treatment short of an offense against the laws of the state, he did not render himself liable to imprisonment. In no sense does any person who enters a train become a criminal merely because he declines to compensate the carrier for services rendered to him in transportation. So long as he refrains from any breach of the reasonable rules and regulations prescribed by the carrier or of the laws of the state, although a trespasser, he can not lawfully be subjected to arrest or any undue or unreasonable physical restraint, or the resultant humiliation ordinarily attendant upon either procedure when unlawful and hence unjustifiable.

The important questions to be determined upon this writ are whether Jennings arrested plaintiff or caused his arrest and detention; and, if he did, whether he then was acting within the scope of his employment. Had Comisky committed any conduct punishable under the provisions of §31, ch. 145, Code, Jennings could without doubt have arrested and detained him with impunity, during such period of time as necessity required for the arraignment and trial under an accusation therefor. Of course, while effecting this purpose, he would have been serving in the dual capacity of a conservator of the peace and as the representative of the company; for that section constitutes railroad conductors conservators of the peace in this state, and grants to them the authority conferred upon officers of that character.

That Jennings did remove plaintiff from the seat he occupied in the car is free from doubt, although the manner of performing that act, whether unnecessarily violent or otherwise, is controverted. He either arrested or caused the arrest of plaintiff. While at first denying it, the conductor finally reluctantly admitted he did make the arrest, assigning as the sole reason therefor the refusal of his demand for fare. But, whatever he did at the inception of the difficulty, the uncontroverted fact is that Cunningham, a deputy sheriff of McDowell county, then a passenger on the car, in nowise connected with or employed by the railroad company, assumed exclusive control of plaintiff and detained him in custody

until the train arrived at its destination at Bluefield. Cunningham then delivered Comisky to H. B. Walters, a police officer of the city, with direction to detain him until a trial could be had before a justice.

Some effort was exerted, though in vain, to establish a relationship between Cunningham and the defendant company, the obvious intent and purpose of which was to lay a foundation whereon to base a claim of liability on it for Cunningham's official conduct. The want of any such connection is clearly proved. Of that no doubt exists. For his acts, however unlawful they may have been, apart from what is accredited to Jennings, the carrier is not chargeable, unless (1) Jennings knew, or failed to know when (if reasonably diligent in the performance of the duties devolving on him) he ought to have known, Comisky had done nothing to justify the treatment inflicted on him; or unless (2) he as the conductor delivered Comisky to Cunningham with direction to cause his further detention that he might be prosecuted for an offense not lawfully punishable except by ejection, or for some unlawful purpose. To render the carrier responsible for the resultant consequences of such continued detention, it must appear, as we have said, that the conductor at the time was engaged in performing the functions assigned him by his principal, in other words, within the scope of the authority impliedly conferred on him.

That Jennings knew, counseled, directed or was aware of what was done after Cunningham assumed control of plaintiff immediately subsequent to the arrest until the time fixed for the trial at eight o'clock on the following evening, no testimony shows. His connection with the matter apparently ceased when Cunningham took charge of Comisky, except so far as indicated by his appearance as a witness at the trial and in making the complaint on which the trial warrant was issued. Jennings' only participation in the infliction of the injury complained of was in causing the initial apprehension, verification of the complaint, and appearance as a witness. Beyond the demand for fare, he said nothing, except to tell Cunningham to "take this man", of course meaning plaintiff. That he made the statement Jennings denied. No one

except Comisky said he did make it.  But the truth or falsity of the testimony on that phase of the case is now not material. The jury could, and doubtless did, prefer to believe Comisky. That, however, is beside the inquiry whether the act of Jennings rendered his employer liable for the consequences of the subsequent imprisonment.  Or, stated more concisely, is it chargeable for what Cunningham alone did after the arrest, conceding the truth of the statement referred to?

That neither the complaint nor warrant charged any offense is a fact not disputed or in anywise contested.  Nor are the further facts that, except the initial arrest, and delivery of Comisky to Cunningham, Jennings did nothing towards effecting the incarceration, and had no knowledge thereof until summoned to appear as a witness at the trial twenty six hours later.  He then did make the complaint, the only charge preferred being non-payment of fare.  Of this charge Comisky was acquitted.  As it did not present any offense legally punishable, of course he promptly and properly was discharged, although the imprisonment had continued during twenty six hours, part of which time Jennings was not engaged in the actual service of the company, nor was he when he verified the complaint.  But the carrier can not escape liability merely because its agent failed to know what his duty required him to know as to the probable effect of an arrest which he participated in procuring, the resultant consequences of which he should have anticipated.

That a carrier is chargeable with the consequences of the unlawful acts of its employees while engaged in the performance of the duties entrusted to them, and as a part of such duties, is a doctrine generally recognized and frequently applied.  The chief difficulty lies in its proper application to the facts proved in each case.  Most of the decisions are predicated upon proof of wrongs done to passengers, as to whom the law requires the exercise of a very high degree of care, due to the contract for safe carriage.  The courts hold the carrier to a strict accountability for any unlawful imposition of restraint or divergence from a just and reasonable treatment by its servants, so long as the passenger refrains from violation of the terms of the contract or the reasonable rules and

regulations of the company and from disorderly or riotous behavior.

It has been held in an action for false imprisonment of a passenger, in *Knickerbocker Steamboat Co.* v. *Cusack,* 172 Fed. 358, that "appearing before a magistrate and making an unjustifiable charge against the plaintiff is a continuation of the original wrong in causing him to be arrested and taken before the magistrate, and that the carrier's liability extends to the detention of the plaintiff under the magistrate's order". The same principle was stated and applied in *Brown* v. *Railroad Co.,* 34 Hun 471; *Jacobs* v. *Railroad Co.,* 75 N. Y. S. 679; *Lynch* v. *Railway Co.,* 90 N. Y. 77; *Baumstein* v. *Railway Co.,* 107 N. Y. S. 23; *Grayson* v. *Transit Co.,* 71 S. W. (Mo.) 730; *Railroad Co.* v. *Luleich,* 85 Ill. App. 643; *Railroad Co.* v. *Cain,* 81 Md. 688; *Railroad Co.* v. *Kupper,* 118 S. W. (Ky.) 266. These were cases involving causes of action arising out of arrests of passengers by the carrier's agents while actually in the service of the master. In some of them a dispute arose as to the payment of fares, followed by an explicit direction of the agent to a police officer to apprehend and detain the passenger for trial on an accusation thereafter made based on such nonpayment, and of which he was acquitted on a trial therefor. There was such immediate and intimate connection between the initiatory and final stages of the transactions as to induce the opinion, expressed in different form in the several proceedings, that there was such continuity in the invasion of the rights of the passenger as to constitute one continuing act, beginning with the first assault by the agent and terminating in the discharge by the magistrate or court. The cases proceeded upon the theory that, as the carriers through their duly authorized agents had set in motion the legal machinery which resulted in the unlawful imprisonment, they were responsible for the ultimate consequences, in the absence of any satisfactory explanation on their part. Such, indeed, is a logical deduction where the proof shows, as it did in each of the cases cited, the uninterrupted sequence of the events following each other in regular order from the incipiency to the final termination of the entire transaction.

The case of *Knickerbocker Steamboat Co.* v. *Cusack, supra,* affords an apt illustration of the facts detailed as the basis for the recoveries sought, obtained and affirmed in the other cases cited. The mate of the steamboat operated by the company designated plaintiff below as the person guilty of disorderly conduct while a passenger on the boat, and directed the police officer to "catch that fellow and take him", and the officer arrested and detained him. The mate afterwards made a formal complaint before a magistrate charging disorderly conduct, not warranted by the facts, and of which plaintiff was discharged on the hearing. "In the circumstances", the court said, "we think the conduct of the mate after the arrest may justly be regarded as a continuation of the original wrong, for which defendant was liable, and that the subsequent proceedings were the direct result of the unjustified and pernicious activity and urgency of the mate, and only indirectly and remotely attributable to the action of the committing magistrate". In *Gunnell* v. *Weston,* 88 N. Y. S. 781, in circumstances somewhat similar, the New York court said: "If a private individual identifies a person as one who has been guilty of a crime, and requires a police officer to arrest him without a warrant, the arrest is the joint act of the private individual and the peace officer, and if the arrest is unwarranted and illegal both the police officer and the private individual are joint tort feasors and both are liable for the wrong".

This rule was quoted with approval in *Polonsky* v. *Railroad Co.,* 184 Fed. 561, the court holding that the policeman was without authority to make an arrest upon the mere direction of a Pullman conductor to incarcerate another without a warrant, and that the plaintiff had a right of action for false imprisonment against the company whose servant the conductor was. In *Corbett* v. *Street Railway Co.,* 42 Hun 587, wherein a passenger refused when demanded to return money collected by him from another passenger to compensate himself for an admitted over-payment of fare, the court held defendant liable and that the liability included "the entire injury and indignity to which the plaintiff was subjected not only by his removal from the car but by his subsequent

imprisonment and detention in the station house''. See also *Krulevitz* v. *Railroad Co.*, 143 Mass. 228; *Dwyer* v. *Transit Co.*, 108 Mo. App. 152. And where a passenger presenting a ticket rightfully refuses to pay a cash fare or leave the train, and is arrested and incarcerated by a police officer, not for what the officer saw or heard but because the conductor told him to do so, it was held in *Elser* v. *Southern Pacific Co.*, 7 Cal. App. 493, that ''in ordering the arrest the conductor was acting for the carrier and within his authority, it being the method adopted by him to effect the passenger's ejection'', and that the carrier was liable for the arrest and detention. So where a conductor pointed out to an officer a passenger as a pickpocket, and the officer arrested him and committed him to jail, where he was detained for several hours and then released, it was held, in *Schmidt* v. *Railroad Co.*, 116 La. 311, that the carrier was responsible, on the ground that although the conductor did not himself make the arrest he was the instrumentality through which it and the resulting consequences were effected. These authorities, it is true, do not directly deal with the situation presented by the record in this case; but they seem sufficient to justify the conclusion embodied in the verdict and judgment complained of.

Defendants also challenge the accuracy of the first instruction given for plaintiff, and the correctness of the refusal to give two instructions offered by them. The principles stated justified the ruling on the prayer of plaintiff for the direction given in his behalf. That instruction, in an abbreviated form, virtually embodied what has been said in respect of the carrier's liability for the tortious acts of its servant and codefendant, and was not erroneous. The theory on which defendants predicated the instruction propounded by them and refused was that they were not responsible for the consequences of the arrest on an invalid charge, if Comisky was guilty of an offense committed by him while on the train, although not charged in the complaint or warrant. While plausible, this contention finds no support in the authorities cited or found. Some proof submitted to the jury and considered by them tended to show plaintiff was at the time of the arrest somewhat intoxicated and had theretofore used

profane language while on the train. That such was his con-
dition, and that he was guilty of profanity, were questions
determined by the verdict adversely to the contention urged
to sustain the propriety of the instruction. The verdict may
have been different had it been given. *Railroad Co.* v. *Cain,
supra,* and *Anania* v. *Railway Co.,* 87 S. E. 167, are cited
to show error in the refusal so to instruct the jury. But
they do not have that effect. *Snead* v. *Bonnoil,* 63 N. Y. S.
553, tends to support the ruling of the trial court. Snead was
arrested as "a suspicious person", because he had in his pos-
session in the streets of New York City an unusual quantity
of silverware for a pedestrian, which he had immediately be-
fore endeavored to hypothecate for a loan of money. When
examined at the station house, he had concealed about his per-
son a dangerous weapon in violation of a city ordinance.
He was discharged from arrest on the felony charge, and at
once re-arrested for carrying a concealed weapon. The court
said: "Where an arrest without a warrant for a felony was
not justified by the circumstances, the persons making the
arrest are liable for false imprisonment, even if the arrest
was justified because of the undisclosed fact that the person
arrested was carrying a concealed weapon and was therefore
guilty of a misdemeanor, failure of the officers to take him
before a magistrate without unnecessary delay and charge
him with the offense making them trespassers *ab initio.*" That
case differs from this only in respect of the time of the dis-
closures. But it was said generally in *Malcolmson* v. *Scott,*
56 Mich. 459, that an arrest for one purpose can not be jus-
tified by proof of a separate and distinct offense. Nor does
*Ogg* v. *Murdock,* 25 W. Va. 139, justify the conclusion that
it holds such proof available by way of exonerating defend-
ants from damages in this action. The court said the mere
informality or lack of perspicuity in the affidavit for an at-
tachment under chapter 106, Code, did not alone furnish
grounds for the recovery sought in that action. We perceive
no error in rulings on the instructions.

But it must not be understood that the evidence of conduct
violative of an express statutory provision is wholly inad-
missible in the circumstances detailed because not admissible

for a particular purpose. The proof of disorderly conduct was introduced upon the trial without objection, and was properly received in mitigation of damages, notwithstanding the illegality of the apprehension and imprisonment. In *McCall* v. *McDowell,* 15 Fed. Cas. 1235, proof of violent and abusive language uttered by plaintiff regarding the assassination of President Lincoln, and for the use of which McCall was illegally arrested, was deemed proper upon the trial in an action for false imprisonment, by way of mitigating the damages claimed by plaintiff; and, although denying the competency of testimony to show the bad character of the plaintiff as proof of probable cause, in *Dunn* v. *Cole,* 2 Tex. App. 125, it was held admissible in reduction of damages. 1 Whart. Ev. §§47, 54. So proof that the person arrested resisted the officer or otherwise provoked resort to force to subdue him was admitted for the same purpose. *Petit* v. *Colmery,* 4 Pennew. (Del.) 266; *Palmer* v. *Railroad Co.,* 92 Me. 399; *Thomas* v. *Powell,* 32 Bing. (Eng.) 746. Such, indeed, seems to be the general rule.

Finally, it is argued that the damages allowed by the jury are excessive. While, because of the behavior of Comisky, of his apparent willingness to invite or at least not to avoid conditions which might induce arrest, and of the not infrequent previous punishment by fines and imprisonment which had theretofore doubtless properly been inflicted for drunkenness and other unlawful behavior, there seems to be more than usual merit in the contention that the jury assessed excessive damages; yet it was within their province to fix the amount; and the court feels bound, by many decisions, to yield to their judgment, in the absence of a reasonable inference of duct on their part. Besides, the conduct of Jennings was not without reproach. Had he exercised sound judgment or ordinary prudence, or had he ejected plaintiff from the car, as lawfully he could have done, there would perhaps have been no occasion for this litigation.

Our order will affirm the judgment.

UPON REHEARING.

No proposition relied on by counsel and decided upon the former hearing is presented now for readjudication; and the only new one advanced is that, as plaintiff was attempting, without payment of fare when demanded, to secure passage on the train of a carrier engaged at the time in the transportation of passengers and interstate shipments, that attempt constituted a violation of the act of congress to regulate commerce, approved February 4, 1887, as amended June 29, 1906, and, as such, was punishable as therein provided; or a violation of sections 6 and 7, ch. 9, acts 1913, ch. 15-0, Code.

The federal act, as amended, provides: "No common carrier subject to the provisions of this act shall, after January 1, 1907, directly or indirectly, issue or give any interstate free ticket, free pass or free transportation for passengers except to its employees"; and "any common carrier violating the provision shall be deemed guilty of a misdemeanor and for each offense on conviction shall pay to the United States a penalty of not less than one hundred dollars nor more than two thousand dollars", and any person other than those excepted therein "who uses such interstate free ticket, free pass or free transportation shall be subject to a like penalty". No less specific as to the carrier is the state statute, which de clares: "No public service corporation subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive from any person, firm or corporation a greater or less compensation for any service rendered or to be rendered than it charges, demands, collects or receives from any other person, firm or corporation for doing a like and contemporaneous service under the same or substantially similar circumstances and conditions. It shall be unlawful for any public service corporation subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality or any particular character of traffic or service in any respect whatsoever, or to subject any particular person, firm, corporation, company or locality, or any particular character of traffic or service, to any undue or

unreasonable prejudice or advantage in any respect whatever.''

Virtually there is but little appreciable difference between these statutes, except that one prescribes like punishment for both violators and the other punishment for the carrier only. Both purport to provide remedies to prevent intolerable corporate transportation practices theretofore prevailing among common carriers and their patrons, and to prescribe punishment for a violation of their provisions. The shipper or passenger and the carrier were guilty alike of the evils sought to be remedied. It required the combined acts of both to grant and obtain an unjust discrimination. Neither alone could or did accomplish that object. It resulted ordinarily from a joint combination in which both were participants, and each of them the statutes inveigh against and aim to punish. Clearly, that was the purpose and effect of the act of congress. But an analysis of each statute discloses an intention to prescribe punishment only where there is an express or implied agreement between the carrier and passenger or shipper in the nature of a combination to defeat the effective operation of both acts by dispensing and receiving privileges or favors prescribed as unlawful. To issue or give, concede directly or indirectly, import joint action, open or covert, by two or more persons, the giver and recipient. One person alone is incompetent to grant benefactions without the participation of another active agency near or remote, provided it is competent to receive and does receive the benefits conferred. In all gifts and concessions, three co-operative factors exist—the giver, the gift or favor conceded, and the recipient; and to be efficacious they can concur only by the actual agreement of the active agencies, or by consent implied from circumstances. Within these limitations, it can not be contended successfully the act and conduct of Comisky fall. The defendant did not enter into any agreement with him, nor he with it, express or implied, for transportation to Bluefield, without payment of fare. The converse of that proposition appears conclusively. He endeavored to secure passage without the knowledge or consent of the defendant's representative in charge of the train. It was as a ''dead head''

passenger, or perhaps as an employee of the company, that he sought transportation.

But, if it be conceded that the act of Comisky was in violation of either or both statutes, and that the defendant was a carrier engaged in operating an interstate railroad transportation of passengers, the *concessum* will not avail as a defense to the action, as Comisky was not charged with such violation, but with a wholly different and distinct offense. On that proposition the authorities cited in the original opinion are, we think, conclusive.

We reaffirm the judgment.

*Affirmed.*